**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MICHAEL VACCARO, DOUGLAS VINCENT O'DELL, and AFSHIN MIKAILI, individually, and as representatives of a Class of Participants and Beneficiaries of The Pearson Retirement Plan,<br><br>        Plaintiffs,<br><br>        v.<br><br>PEARSON EDUCATION, INC., BOARD OF DIRECTORS OF PEARSON EDUCATION, INC., ADMINISTRATIVE COMMITTEE FOR THE BENEFIT PLANS OF PEARSON EDUCATION, INC., | Class Action Complaint For Claims Under 29 U.S.C. § 1132(a)(2) |

---

## CLASS ACTION COMPLAINT

---

Plaintiffs, Michael Vaccaro, Douglas Vincent O'Dell, and Afshin Mikaili ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries of The Pearson Retirement Plan ("Plan" or "Pearson Plan"), by their counsel, WALCHESKE & LUZI, LLC and SCHNEIDER WALLACE COTTRELL KONECKY LLP, allege and assert to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

### INTRODUCTION

1.      401(k) defined contribution plans such as the Pearson Plan have become America's primary retirement savings vehicle. As with all defined contribution retirement plans that require participants to bear the costs of plan administration, the Plan participants' retirement savings suffer when the Plan mismanages plan assets, when employers use Plan assets for their own benefit, or pay excessive plan administration fees.

2.      Defendants Pearson Education, Inc. ("Pearson"), the Board of Directors of Pearson Education, Inc. ("Board"), and the Administrative Committee for the Benefit Plans of Pearson

Education, Inc. ("Plan Committee") (collectively, "Defendants"), utilized the Plan's forfeitures, a type of plan asset to benefit themselves by reducing their employer contributions to the Plan, violating ERISA's fiduciary duty of loyalty and fiduciary prohibited transaction rules.

3.      Furthermore, Defendants failed to implement a prudent fiduciary process to control the Pearson Plan's overall managed account ("MA") expenses, and Plan participants in the MA program paid vastly more than what comparable very large retirement plans pay for comparable MA services.

4.      Plaintiffs, current and former participants, in the Pearson Plan, bring this ERISA action in a representative capacity on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2), and under Fed. R. Civ. P. 23 as representatives of a class of participants and beneficiaries of the Pearson Plan, against Defendants for breach of the duty of loyalty and for transactions prohibited by ERISA, as well as for breach of the fiduciary of prudence with regard to managed accounts. Plaintiffs' claims are brought on behalf of the Plan and seek to remedy losses suffered by the Plan under 1132(a)(2) and 409(a).

5.      More specifically, Plaintiffs allege that Defendants: (a) improperly utilized forfeited Plan assets to disloyally reduce future employer contributions for their own selfish interests; (b) engaged in fiduciary prohibited transactions by enriching themselves through the Pearson Plan's Personal Management Program ("PMP") MA service; and (c) failed to monitor the Plan Committee with regard to the use of Plan forfeitures and with regard to the excessive Plan MA services.

## JURISDICTION AND VENUE

6.      This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. §§ 1132(a)(2) and (3) for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

7.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

8.      This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred here.

## PARTIES AND THE PLAN

9.     Pearson Education, Inc., known since 2011 as simply Pearson, is an educational publishing and services subsidiary of the international corporation Pearson plc. As of 2023, Pearson Education has testing/teaching centers in over 55 countries worldwide; the UK and the U.S. have the most centers. The headquarters of parent company Pearson plc are in London, England. Pearson is headquartered in the United States at 221 River Street, Hoboken, NJ 07030, but has hundreds of employees working remotely in Illinois and at its locations at 226 W Jackson Blvd, Chicago, IL 60606, 111 E Wacker Dr, Ste 515, Chicago, IL 60601, 516 North Ogden Ave, Suite 111 Chicago, IL 60642, and 13036 Collection Center Drive, Chicago, IL 6069,  to name just several Chicago-based locations.

10.     The Pearson Plan is a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).

11.     Pearson is the Plan's sponsor under 29 U.S.C. § 1002(16)(B).

12.     The Plan Committee is the Plan's administrator within the meaning of 29 U.S.C. § 1002(16)(A), and are fiduciaries for the Plan. In addition, the members of the Committee (the Plan Committee Members) are also fiduciaries for the Plan. "[W]here, as here, a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir. 2000).

13.     As required by 29 U.S. C. § 1102(a)(1), the Plan is established and maintained by a written plan document, The Pearson Retirement Plan ("Plan document").

14.     Defendants chose Great-West Financial Retirement Plan Services and its operating subsidiary Empower Retirement ("Empower") to provide Plan recordkeeping services during the Class Period.

15.     Defendants chose Empower Advisory Group ("EAG"), a wholly-owned subsidiary of Empower, to provide MA services, subadvised by Edelman Financial Engines ("Financial Engines"), to Plan participants through the Professional Management Program ("PMP") during the Class Period.

16.     Plaintiff Michael Vaccaro is a resident of Buchanan, New York. Plaintiff Vaccaro worked for Pearson as a Sales Representative, Marketing Manager, Director of International Marketing, Director of Business Development, remotely and in Upper Saddle River, NJ from May 1998 until July 2016.  While in the Plan, he participated in the managed account program. He rolled out of the Plan on March 31, 2021.

17.     Plaintiff  Douglas Vincent O'Dell is a resident of North Wales, Pennsylvania. He had been employed by Pearson from April 2021 until June 2022 as Senior Director of Product Design. He rolled out of the Plan on January 10, 2023.

18.     Plaintiff Afshin Mikaili is a resident of Willowbrook, Illinois.  He was employed by Pearson from November 2012 to July 2023. He worked in Elk Grove Village, Illinois, from 2012-2020 and remotely from Willowbrook, Illinois from 2020 to 2023, in the positions of Managing Director, Academic Partnerships, and as Director, Partner Success. He enrolled in the Plan in 2012 and is a current participant in the Plan.

19.     Plaintiffs have Article III standing to bring this action on behalf of the Pearson Plan because they suffered actual injuries to their Plan accounts by not having forfeited Plan assets reallocated to their Plan accounts as a result of Pearson reducing employer contributions for their own benefit and Plaintiff Vaccaro also paid excessive MA fees. Those injuries are fairly traceable to Defendants disloyally using Plan forfeitures for their own benefit to reduce their future contributions to the Pearson Plan and by imprudently paying excessive MA fees. Finally, these injuries diminished the savings in Plaintiffs' retirement accounts in the Plan and reduced, dollar for dollar (and more when compounded) Plaintiffs' retirement savings.

20.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

21.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive MA fees, as well as the misuse and misallocation

of Plan forfeitures) necessary to understand that Defendants breached their fiduciary duties and engaged in prohibited transactions until shortly before this suit was filed.

22.     Having never managed a very large 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of the excessive MA fees, and of the misuse and misallocation of Plan forfeitures.

23.     With 19,135 active participants and $2,271,435,898 in assets under management as of December 31, 2023, the Pearson Plan is one of the largest retirement plans in the country. It ranks in the top 0.10% of over 500,000 401(k) plans in terms of the number of participants and the top 0.10% of plans in terms of the value of its assets.

## ERISA FIDICIARY STANDARDS

24.     ERISA exists, in large part, to protect the interests of participants, and their beneficiaries, in employee retirement plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citing 29 U.S.C. § 1001(b)).

25.     "[A]ny person who exercises discretionary authority or control in the management or administration of an ERISA plan" is, under the statute's terms, a fiduciary. *See Barchock v. CVS Health Corp.*, 886 F.3d 43, 44 (1st Cir. 2018) (citing 29 U.S.C. § 1002(21)(A)).

26.     ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Pearson Plan, that are covered by ERISA.

27.     ERISA provides that  "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of like character and with like aims." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

28.     These duties are "the highest known to the law." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 943 (7th Cir. 2024) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

29.     The obligation to ensure that retirement plan fees are reasonable is at the heart of ERISA fiduciary duties. *Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) ("The responsibility for paying reasonable compensation was the unequivocal fiduciary responsibility of the [plan's fiduciaries].").

30.     The continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*") (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3)).

31.     "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525.

32.     Plan fiduciaries therefore have a continuing duty to monitor Plan MA expenses to make sure that they are not excessive with respect to the MA services received. *Hughes II*, 63 F.4th at 626 (citing *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016)).

33.     The inquiry into the duty of prudence is "context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

34.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating MA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

35.     Defendants are ERISA fiduciaries as they exercise discretionary oversight, authority, or control over the Pearson Plan that it sponsors and provides to its employees.

36.     Defendants failed to fulfill their duty to prudently control the managed account expenses paid by the Plan.

37.     Because Defendants are fiduciaries to the Plan and "deal[t] with the assets of the plan in [their] own interest or for [their] own account," they violated the fiduciary duty of loyalty and fiduciary prohibited transaction tule under 29 U.S.C. § 1108(b)(1), by benefiting themselves as far as reducing their own future contributions to the Pearson Plan.

## FACTUAL ALLEGATIONS

### A.    PEARSON'S DISLOYAL AND PROHIBITED USES OF PLAN FORFEITURE ASSETS

38.    The Pearson Plan is funded by a combination of wage withholdings by Plan participants and Company matching and non-elective contributions, each of which is deposited into the Plan's trust fund.

39.    Pearson is obligated to make contributions that match employee contributions. The matching formula currently used is 100% of the first 3% of pay, plus 50% of the next 4-8% of pay employees contribute to the Plan each pay period.

40.    Upon their deposit into the Plan's trust fund, all participant contributions and Company contributions become *assets of the Plan*.

41.    As an individual account, defined contribution retirement plan, the Pearson Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

42.    Participants are fully vested in their salary deferrals plus actual earnings thereon. Vesting in Employer contributions is based on years of qualified service and vest fully after three years of service.

43.    Forfeitures are the nonvested portion of a participant's account that is lost upon termination of employment.

44.    The Pearson Plan gave the Plan Committee a discretionary choice about how to use the forfeitures each year.

45.    In particular, the Plan Committee could allocate the forfeited funds to reduce the Plan's expenses, thereby saving the Participants (who otherwise pay those expenses) money, or the Plan Committee could elect to use the forfeited funds to offset Pearson's own obligation to make matching contributions.

46.    The 2021 version of the Pearson Plan Summary Plan Description ("SPD") states:

**Forfeiture of Nonvested Amounts**

If you leave the Company or a related company before you are 100% vested in your Plan account, the nonvested portion of your account will be forfeited and *either* used to pay Plan expenses *or* applied to future Company contributions. (emphasis added)

47.     This provision means that Plan forfeitures will be used to **either** reduce Company contributions **or** pay Plan expenses, as determined by the Plan Committee *in its sole discretion.*

48.     In 2019, the Financial Statement Notes attached to the 2019 Form 5500 (page 29 of 40) states: "At December 31, 2019 and 2018, net assets available for benefits include unallocated amounts totaling $6,709,536 and $7,429,658 respectively, which represent pre-funded employer contributions and forfeited nonvested accounts. Forfeited nonvested accounts **may be used** to reduce future employer contributions. During 2019 and 2018, employer contributions were reduced by $5,256,935 and $2,149,239 respectively, from forfeited nonvested accounts." (emphasis added).

49.     In 2020, the Financial Statement Notes attached to the 2020 Form 5500 (page 29 of 40) states: "At December 31, 2020 and 2019, net assets available for benefits include unallocated amounts totaling $7,128,622 and $6,709,536 respectively, which represent pre-funded employer contributions and forfeited nonvested accounts. Forfeited nonvested accounts **may be used** to reduce future employer contributions. During 2020 and 2019, employer contributions were reduced by $4,895,153 and $5,256,935 respectively, from forfeited nonvested accounts." (emphasis added).

50.     In 2021, the Financial Statement Notes attached to the 2021 Form 5500 (page 32 of 43) states: "At December 31, 2021 and 2020, net assets available for benefits include unallocated amounts totaling $7,431,172 and $7,128,622 respectively, which represent forfeited nonvested accounts. Forfeited nonvested accounts **may be used** to reduce future employer contributions. During 2021, employer contributions related to the year ended December 31, 2020 were reduced by $3,935,560. During 2020, employer contributions related to the year ended December 31, 2019 were reduced by $4,895,153. Subsequent to year end, employer contributions related to the year ended December 31, 2021 were reduced by $1,691,297." (emphasis added).

51.     In 2022, the Financial Statement Notes attached to the 2022 Form 5500 (page 30 of 38) states: "At December 31, 2022 and 2021, net assets available for benefits include unallocated amounts

totaling $9,484,256 and $7,431,172 respectively, which represent forfeited nonvested accounts. Forfeited nonvested accounts *may be used* to reduce future employer contributions and are also held to restore accounts for participants who return to employment. During 2022, employer contributions related to the year ended December 31, 2021 were reduced by $3,513,392. During 2021, employer contributions related to the year ended December 31, 2020 were reduced by $3,935,560." (emphasis added).

52.    In 2023, the Financial Statement Notes attached to the 2023 Form 5500 (page 31 of 40) states: "At December 31, 2023 and 2022, net assets available for benefits include unallocated amounts totaling $8,430,065 and $9,484,256 respectively, which represent forfeited nonvested accounts. Forfeited nonvested accounts *may be used* to reduce future employer contributions and are also held to restore accounts for participants who return to employment. During 2023, employer contributions related to the year ended December 31, 2022 were reduced by $5,107,012. During 2022, employer contributions related to the year ended December 31, 2021 were reduced by $3,513,392." (emphasis added).

53.    The following table illustrates the amount the Plan and its participants (including Plaintiffs) lost as a result of Defendants' using Plan forfeitures *exclusively* for their own benefit during the Class Period, rather than defraying Plan expenses as permitted:

| Forfeitures Used for Employer's Benefit | | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Forfeitures Used to Reduce Employer Contributions | $2,149,239 | $5,256,935 | $4,895,153 | $5,626,857 | $3,513,392 | $5,107,012 |
| Compounding Percentage (Plan Return) | | 22.37% | 11.86% | 16.44% | -14.97% | 17.17% |
| Potential Cumulative Compounded Losses | $2,149,239 | $7,887,060 | $13,717,239 | $21,598,716 | $21,878,933 | $30,741,577 |
| Sources: | 2018 Form 5500, Page 29 of 40 | 2019 Form 5500, Page 29 of 40 | 2020 Form 5500, Page 29 of 40 | 2021 Form 5500, Page 32 of 43 | 2022 Form 5500, Page 30 of 38 | 2023 Form 5500, Page 31 of 40 |

54.    This calculation is based on the theory that using any forfeitures for reducing employer contributions is *per se* a violation of ERISA because plan assets in trust should be used for the purpose for which they were contributed in the first place: for the benefit of Plan participants.

55.     Defendants could have otherwise just allocated this forfeiture money to participant accounts and obviously the participants would have been better off if their best interests had been taken into account by the Plan Committee.

56.     ERISA explicitly requires Plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

57.     Furthermore, in deciding to use Plan forfeiture to benefit itself as far as reducing future company contributions through use of plan assets, Defendants acted with a conflict of interest in administering the Plan and in managing and disposing of its assets. Such self-dealing violates the ERISA fiduciary prohibited transaction rules under 29 U.S.C. § 1106(b).

58.     Defendants have not used the forfeited funds to pay Plan expenses and have thereby failed to reduce or eliminate the amounts charged to the participants' individual accounts to cover such expenses.

59.     Instead, Defendants have consistently utilized the forfeited funds in the Plan exclusively for the Company's own benefit, to the detriment of the Plan and its participants, by using these Plan assets solely to reduce Pearson's obligation to making matching contributions to the Plan.

60.     It would have been in the best interests of the Plan and its participants for Pearson to use the forfeiture amounts to defray the Plan's administrative expenses, rather than to reduce Pearson's own contribution obligation, which amounted to self-dealing on Pearson's part as a fiduciary with plan assets.

61.     In so doing, Defendants breached their fiduciary duty of loyalty to the Plan, and cost the Plaintiffs and class members tens of millions of dollars of lost retirement income.

62.     The forfeiture money should not have been used to benefit Pearson through reduced Plan employer contributions and instead, should have been reallocated to Plan participant accounts to both pay Plan expenses and to reallocate any forfeiture surpluses to Plan participant accounts.

63.    At the very least, Defendant should have used the fiduciary discretion granted to it in the Plan document to pay Plan administration expenses before using it for employer contributions:

| Forfeitures Not Used for Direct Plan Expenses *(Disloyal Discretion)* | | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Minimum Forfeitures Available to offset Plan Expenses | $2,149,239 | $5,256,935 | $4,895,153 | $5,626,857 | $3,513,392 | $5,107,012 |
| Total Direct Compensation | $1,373,375 | $1,310,076 | $1,512,470 | $2,090,076 | $1,983,482 | $1,995,446 |
| Forfeitures used to pay Plan Expenses | $0 | $0 | $0 | $0 | $0 | |
| Potential Losses | $1,373,375 | $1,310,076 | $1,512,470 | $2,090,076 | $1,983,482 | $1,995,446 |
| *Compounding Percentage (Plan Return)* | | *22.37%* | *11.86%* | *16.44%* | *-14.97%* | *17.17%* |
| Potential Cumulative Compounded Losses | $1,373,375 | $2,990,740 | $4,857,768 | $7,746,286 | $8,570,204 | $12,036,769 |

64.    This calculation takes the amount used to reduce employer contributions and caps the calculation based on the amount of compensation actually paid for Plan expenses. This money utilized to benefit Pearson by reducing employer contributions could have otherwise been used to pay expenses that the Plan and Plan participants had to pay.

65.    By using their discretion to use Plan forfeitures to pay Plan expenses, Defendants could have saved Plaintiffs over $12 million dollars in Plan expenses during the Class Period.

66.    Many employers have utilized Plan forfeitures, which are plan assets in exactly this manner to benefit plan participants.

67.    For instance, in their 2022 Form 5500 notes to Financial Statements, the KCI Technologies, Inc. Employee Stock Ownership Plan states the following regarding forfeited accounts: "Forfeitures of Company contributions are first used to restore previously forfeited amounts to rehired employees. To the extent that any forfeitures remain, *they are reallocated to participants' accounts based on the ratio of each participant's account to the aggregate of all accounts*." (emphasis added).

68.    Similarly, in their 2022 Form 5500 notes to Financial Statements, the Enterprise Holdings Retirement Savings Plan states the following regarding forfeited accounts: "[F]orfeited account balances are *allocated to eligible participant accounts* based only on participants' eligible compensation to the extent the participant meets minimum service requirements and is employed as of the end of the plan year." (emphasis added).

69.     Consistent with plans using plan forfeitures in a manner that does not constitute breach of the duty of loyalty and prohibited transactions, the Pearson Plan should have used forfeiture assets to pay off Plan administrative expenses and increased benefits in other participants' accounts rather than benefit themselves by using plan assets for their own purposes to reduce their future employer contributions to the Plan.

70.     By instead using these Plan forfeiture assets to reduce Pearson's obligation to make employer contributions to the Plan, Defendants violated both their duty of loyalty and the fiduciary prohibited transaction rules under ERISA.

71.     These breaches of the duty of loyalty and prohibited transactions cost the Plaintiffs and class members tens of millions of dollars in lost Plan assets that should have been used to pay off Plan expenses and allocated any remaining plan assets to eligible participant accounts.

## B.     EXCESSIVE MANAGED ACCOUNT  SERVICE FEES

72.     The key characteristics of managed account (MA) services are: (1) participants turn over discretion to the advice provider; (2) the provider assumes responsibility for the asset allocation and selection decisions, generally utilizing investment options offered with the plan; and (3) decisions are based on information provided to the provider by the plan sponsor and/or recordkeeper, as well as through interaction with the participant (this information may include investment objectives, risk preferences, and investments held outside the defined contribution plan.

73.     The Pearson Plan provided a managed account (MA) service, Professional Management Program ("PMP"), through Empower's wholly-owned subsidiary, Empower Advisory Group ("ESG"), subadvised by Edelman Financial Engines ("Financial Engines").

74.     The MA services provided by the PMP to the Pearson Plans are materially similar to those provided by Financial Engines to other comparator plans.

75.     Financial Engines provides substantially similar core asset allocation services to all plans for which it acts as the MA service provider.

76.     The MA services provided by Financial Engines to plans are materially the same whether provided directly by Financial Engines or whether they sub-advise through another entity like EAG, as they did with the Pearson Plan.

77.     Financial Engines provides a MA strategy distinctive from its two main competitors, Morningstar and Fidelity.

78.     Unlike Morningstar and Fidelity, Financial Engines provides the same core asset allocation services to all plans for which it acts as the MA service provider.

79.     For instance, plans that use Financial Engines all receive the same MA services and methodology which feature the same key drivers of asset allocation risk level:

(a)     A participant's selected retirement age and selected risk preference will drive allocation;

(b)     Majority of participants use default age (65) and risk preference ("typical");

(c)     "Typical" asset allocation primarily based on DIY participant asset allocations;

(d)     Outside account composition will affect asset allocation (not amount of assets); and

(e)     Other factors such as income and savings may affect retirement income forecast but not managed asset allocations.

80.     With regard to investment manager selection for Financial Engines, underlying investment manager selection for MAs is primarily based on two factors: (1) the plan line-up made available by the Plan Committee from which the MA provider can select; and (2) the MA provider's methodology for analyzing and selecting among strategies.

81.     Across service plans, Financial Engines will primarily select the passive managers in a given plan, and the primary drivers will be fees, turnover, analysis of representative asset class, and Financial Engines may also continue to hold investments a participant already holds.

82.     Because several recordkeepers have additional MA solutions or have built their own, like Vanguard, downward pressure has been created on MA fees across the industry, including for Financial Engines.

83.     Yet, according to Pearson Plan Annual Fee Disclosure Statements for Participants, as of October 26, 2022 and November 27, 2023, the PMP MA advisory fee is "[u]p to $100K = 0.150000%

quarterly (or .60% annually), [n]ext $150K = 0.112500% quarterly (or .45% annually), [o]ver $250K = 0.075000% quarterly (or .30% annually)."

84.    Defendants paid unreasonable compensation for MA fees when compared to similarly-sized plans receiving materially similar MA services from Financial Engines.

85.    Because the MA services provided by Financial Engines to plans are materially similar to other managed account services provided by Financial Engines, the costs of MA services should also be materially similar for plans which have a similar number of participants and assets.

86.    More specifically, these figures for the comparator plans are taken directly from the comparator plans' Fee Disclosures to Participants and show how much less they paid for materially similar MA services from Financial Engines:

**Lenovo:**

| Professional Management Fees | |
|---|---|
| **Managed Account Balance** | **Annual Fee** |
| For the balance up to **$5,000** | 0.00% of this balance |
| For the balance between **$5,000 and $100,000 you'll pay** | 0.35% of this balance |
| For the balance between **$100,000.01 and $250,000 you'll pay:** | 0.25% of this balance |
| For the balance greater than **$250,000 you'll pay:** | 0.10% of this balance |

**PG&E:**

| Professional Management Fees – Effective July 1, 2020 | |
|---|---|
| Managed Account Balance | Annual Fee |
| For all assets: | 0.32% of this balance |

**BlueCross Blue Shield of SC:**

| Professional Management Fees | |
|---|---|
| Managed Account Balance | Annual Fee |
| For the balance up to $100,000 you'll pay: | 0.30% of this balance |
| For the balance between $100,000.01 and $250,000 you'll pay: | 0.20% of this balance |
| For the balance greater than $250,000 you'll pay: | 0.15% of this balance |

**Sony:**

| Professional Management Fees | |
|---|---|
| Managed Account Balance | Annual Fee |
| For the balance up to $250,000 you'll pay: | 0.30% of this balance |
| For the balance greater than $250,000 you'll pay: | 0.25% of this balance |

**Beaumont:**

| Professional Management Fees – Rates Effective January 1, 2017 | |
|---|---|
| **Managed Account Balance** | **Annual Fee** |
| For the balance up to **$5,000** you'll pay: | 0.00% of this balance |
| For the balance between **$5,000.01** and **$50,000** you'll pay: | 0.29% of this balance |
| For the balance between **$50,000.01** and **$150,000** you'll pay: | 0.19% of this balance |
| For the balance greater than **$150,000** you'll pay: | 0.14% of this balance |

87.    Comparing the Pearson Plan's managed account fee rates with those of the comparator plans above, and calculating managed account fee rates based on the average account balance from 2018-2023, provides the following chart:

**Comparable Plans' Managed Account Fee Rates**

| Plan | Average Assets 2018-2023 | Average Participants 2018-2023 | Average Managed Account Direct Comp 2018-2023 ($) | Calculated Fee (%) @ Avg Account Balance | Managed Account Provider |
|---|---|---|---|---|---|
| Lenovo Savings Plan | $2,091,625,856 | 9,370 | $521,113 | 0.287% | Financial Engines |
| PG&E Corporation Retirement Savings Plan | $3,675,381,167 | 12,495 | $2,248,443 | 0.320% | Financial Engines |
| Blue Cross Blue Shield of SC Employee Savings and Salary Reduction Plan | $1,103,906,957 | 12,798 | $967,560 | 0.300% | Financial Engines |
| **The Pearson Retirement Plan 401(K)** | **$2,288,283,864** | **17,033** | **$1,292,817** | **0.562%** | **Financial Engines** |
| Sony USA 401(K) Plan | $4,553,868,244 | 24,179 | $897,128 | 0.300% | Financial Engines |
| Beaumont Health 403(B) Retirement Savings Plan | $2,279,061,396 | 38,088 | $1,062,115 | 0.250% | Financial Engines |

88.    The average of all the comparative plan MA fees from Financial Engines is 29.1 basis points for materially similar MA services that the Pearson Plan receives:

**Comparable Plans' Managed Account Fee Rates**

| Plan | Average Assets 2018-2023 | Average Participants 2018-2023 | Average Managed Account Direct Comp 2018-2023 ($) | Calculated Fee (%) @ Avg Account Balance | Managed Account Provider |
|---|---|---|---|---|---|
| Lenovo Savings Plan | $2,091,625,856 | 9,370 | $521,113 | 0.287% | Financial Engines |
| PG&E Corporation Retirement Savings Plan | $3,675,381,167 | 12,495 | $2,248,443 | 0.320% | Financial Engines |
| Blue Cross Blue Shield of SC Employee Savings and Salary Reduction Plan | $1,103,906,957 | 12,798 | $967,560 | 0.300% | Financial Engines |
| Sony USA 401(K) Plan | $4,553,868,244 | 24,179 | $897,128 | 0.300% | Financial Engines |
| Beaumont Health 403(B) Retirement Savings Plan | $2,279,061,396 | 38,088 | $1,062,115 | 0.250% | Financial Engines |
| | | | Average | 0.291% | |

89.     The following chart shows the breakdown of managed account fees paid by comparator plans to Financial Engines during the Class Period:

**Schedule C - Managed Account Direct Compensation**

| Plan | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | Average |
|---|---|---|---|---|---|---|---|---|
| Lenovo Savings Plan | $512,325 | $483,031 | $500,008 | $553,433 | $545,124 | $532,759 | $3,126,680 | $521,113 |
| PG&E Corporation Retirement Savings Plan | $2,153,232 | $2,147,587 | $2,214,078 | $2,310,615 | $2,350,526 | $2,314,619 | $13,490,657 | $2,248,443 |
| Blue Cross Blue Shield of SC Employee Savings and Salary Reduction Plan | $930,246 | $881,727 | $920,537 | $1,072,356 | $1,029,834 | $970,659 | $5,805,359 | $967,560 |
| Sony USA 401(K) Plan | $926,266 | | $660,387 | $987,825 | $942,579 | $968,582 | $4,485,639 | $897,128 |
| Beaumont Health 403(B) Retirement Savings Plan | $904,819 | $931,632 | $1,001,796 | $1,193,545 | $1,188,370 | $1,152,528 | $6,372,690 | $1,062,115 |

90.     Yet, Pearson continues to pay unreasonable compensation for MA service to Financial Engines for the materially same MA services being received by these other comparator plans with similar numbers of participants and assets during the Class Period.

91.      Whereas Pearson pays on average 56.2 basis points in fees, the comparators plans pay an average 29.1 basis points in fees.

### Excess Compensation over 29.1bps

| Provider | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
|---|---|---|---|---|---|---|---|
| Financial Engines | $1,370,795 | $1,307,396 | $1,209,807 | $1,305,885 | $1,316,977 | $1,246,043 | $7,756,903 |
| | | | | | | | |
| Estimated Assets @ .565% | $242,618,584 | $231,397,522 | $214,125,133 | $231,130,088 | $233,093,274 | $220,538,584 | |
| Estimated Compensation at .29.1% | $706,020 | $673,367 | $623,104 | $672,589 | $678,301 | $641,767 | |
| | | | | | | | |
| Excess Compensation | $664,775 | $634,029 | $586,703 | $633,296 | $638,676 | $604,276 | |
| Compounding Percentage (Plan Return) | | 22.37% | 11.86% | 16.44% | -14.97% | 17.17% | |
| Estimated Cumulative Losses | $664,775 | $1,447,546 | $2,205,858 | $3,201,718 | $3,361,119 | $4,542,348 | |

92.    Pearson's excessive and unreasonable payments to Financial Engines for materially the same MA services provided to other plans by Financial Engines has cost Plan participants enrolled in the MA program, like Plaintiff Vaccaro, over four and half ($4.5) million dollars in lost retirement income:

93.    A plan fiduciary must monitor MA compensation that it pays to the MA service provider by regularly conducting an independent evaluation of those fees to ensure that such managed account fees are reasonable, and remove or renegotiate with the MA provider if those fees are unreasonable or imprudent.

94.    During the Class Period, the high cost of MA services from Financial Engines leads to the plausible inference that Defendants egregiously failed to regularly monitor the MA compensation paid to Financial Engines.

95.    During the Class Period, Defendants failed to consider other alternatives to the Financial Engines service in order to avoid having Plan participants pay excessive and unreasonable MA fees.

96.    During the class period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable MA fees.

97.    The Plan Committee, as Plan fiduciaries, should have compared the Plan PMP MA to other MAs through periodic reviews to determine whether given cost, risk, performance, and other pertinent factors, maintaining Financial Engines, at this fee level, as the Plan MA service provider was prudent.

98.    During the entirety of the class period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the total managed account fees it paid to

Financial Engines, it would have realized that the Plan was compensating Financial Engines unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff Vaccaro and other Plan participants in the PMP MA service.

99.     During the entirety of the class period and by failing to recognize that the Plan and its participants were being charged much higher Plan MA fees than they should have been and/or by failing to take effective and timely remedial actions including replacing Financial Engines, Defendants breached their fiduciary duty of prudence to Plaintiff Vaccaro and to other Plan participants, causing millions of dollars of harm to their retirement accounts.

## C.     CLASS ACTION ALLEGATIONS

100.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1), or, in the alternative, 23(b)(2), of the Federal Rules of Civil Procedure on behalf of the following Subclasses of similarly situated persons:

> Subclass A – Forfeiture Class:
>
> All participants in and beneficiaries of the Pearson 401(k) Plan at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Defendants' breaches through the date of judgment.
>
> Subclass B – Managed Account Class:
>
> All participants in and beneficiaries of the Pearson 401(k) Plan who participated in the Plan managed account program at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Defendants' breaches through the date of judgment

101.   The members of each of the subclasses are so numerous that joinder of all members is impracticable.  At all relevant times, the number of forfeiture class members was approximately seventeen thousand (17,000) or more, while the number of managed account class members was five thousand (5,000) or more.

102.    Common questions of law and fact exist as to all members of each of the Subclasses. Among such questions are:

    i.   Whether Defendants failed in their fiduciary duty of loyalty with respect to the administration, management and supervision of Plan services providers in allocating Plan forfeitures (forfeiture subclass);

   ii.   Whether Defendants failed in their fiduciary duty of prudence to minimize plan MA fees (managed account subclass);

  iii.   Whether Defendants engaged in fiduciary prohibited transactions with plan assets, by using Plan forfeitures to reduce Pearson's Plan contributions rather than reallocating those plan assets to Plan expenses and Plan participants accounts (forfeiture subclass); and,

  iv.   Whether Defendants' breaches of fiduciary duties and prohibited transactions caused losses to the Plan and its participants, and if so, in what amounts (both subclasses).

103.   Plaintiffs' claims are typical of the claims of the forfeiture Subclass and Plaintiff Vaccaro's managed account claims are typical of the claims of the managed account Subclass pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct for each Subclass.

104.   Plaintiffs will adequately represent the Subclasses pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

105.   Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

106.   In the alternative, certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

107.   Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

108.    The claims brought by the Plaintiffs arise from fiduciary breaches and prohibited transactions as to the Plan in its entirety and does not involve mismanagement of individual accounts.

109.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan.

110.    Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

111.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

112.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on Behalf of Themselves and Class, Against**
**<u>Defendant Plan Committee – Excessive Managed Account Fees)</u>**

113.    Plaintiffs restate the above allegations as if fully set forth herein.

114.    Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

115.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

116.    Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting MA providers that charge objectively reasonable managed account fees.

117.    During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's managed account fees were objectively reasonable; defray

reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

118.   During the Class Period, Defendant Plan Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's managed account fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

119.   During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's managed account providers, EAG and Financial Engines, to make sure they were providing the managed account services at reasonable costs, given the highly competitive market surrounding managed account services and the enormous bargaining power the Plan had to negotiate the best fees, and replace the imprudent managed account service with less expensive services.

120.   During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's managed account service critically or objectively in comparison to other MA options available to the Plan.

121.   Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

122.   As a result of Defendant Plan Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

123.   Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Pearson Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from

the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on Behalf of Themselves and Class, Against**
**<u>Defendants Pearson and Board – Managed Account Fees</u>)**

124.   Plaintiffs restate the above allegations as if fully set forth herein.

125.   Defendants Pearson and Board had the authority to appoint and remove members or individuals responsible for managed accounts on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

126.   In light of this authority, Defendants Pearson and Board had a duty to monitor those individuals responsible for managed account fees on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

127.   Defendants Pearson and Board had a duty to ensure that the individuals responsible for managed account fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to managed account fees; and reported regularly to Defendants Pearson and Board.

128.   The objectively unreasonable and excessive managed account fees paid by the Plan by having EAG and Financial Engines' managed account program inferentially establish that Defendants Pearson and Board breached their duty to monitor by, among other things:

   (a)    Failing to monitor and evaluate the performance of individuals responsible for managed account fees on the Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably managed account fees;

   (b)    Failing to monitor the process by which the Plan's MA providers, EAG and Financial Engines, were evaluated and failing to investigate the availability of more reasonably-priced MA service alternatives; and

(c)    Failing to remove individuals responsible for managed account fees on the Plan Committee whose performance was inadequate in that these individuals continued to pay the same managed account fees over numerous years even though the contracted price was imprudent and excessively costly, given the lack of value associated with the EAG and Financial Engines managed account program.

129.    As a consequence of the breach of the duty to monitor the Plan's managed account fees, the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

130.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Pearson and Board are liable to restore to the Pearson Plan all losses caused by their failure to adequately monitor individuals responsible for Plan managed account fees on the Plan Committee. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### THIRD CLAIM FOR RELIEF
### Breach Of Duty Of Loyalty
### (Plaintiffs, On Behalf Of Themselves And Class,
### Against Plan Committee – Misallocation Of Forfeitures)

131.    Plaintiffs restate the above allegations as if fully set forth herein.

132.    Defendant Plan Committee is a fiduciary of the Pearson Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

133.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), Defendant Plan Committee was required to discharge their duties to the Pearson Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

134.    Defendant Plan Committee have continually breached this duty of loyalty with respect to their control and management of the Plan's assets throughout the class period by choosing to utilize forfeited funds in the Plan for the sole benefit of Pearson rather than exclusively in the interest of the Plan participants and beneficiaries.

135.    Instead of acting solely in the interest of Plan participants by utilizing forfeited funds in the Plan to reduce and eliminate the administrative expenses charged to their individual accounts, or provide additional allocations to Plan accounts, Defendant Plan Committee discretionarily chose, as

fiduciaries, to use Plan assets for the exclusive purpose of reducing Pearson's outstanding and future contributions to the Plan, thereby saving Pearson tens of millions of dollars at the expense of the Plan.

136.   In making this decision, Defendant Plan Committee was motivated primarily or exclusively by their own self-interest rather than the interests of the Plan's participants and beneficiaries.

137.   As a direct and proximate result of Defendant Plan Committee's fiduciary breaches described herein, the Plan suffered injury and loss for which it is personally liable and is subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

138.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**FOURTH CLAIM FOR RELIEF**
**Fiduciary Prohibited Transactions**
**(Plaintiffs, On Behalf Of Themselves and Class,**
**Against Plan Committee – Self-Dealing With Forfeitures)**

139.   Plaintiff restates the above allegations as if fully set forth herein.

140.   29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not," among other things, "deal with the assets of the plan in his own interest or for his own account."

141.   Defendant Plan Committee violated this prohibition in its management and control of forfeiture funds in the Plan. By allocating these Plan assets toward offsetting Pearson's future contributions owing to the Plan, thereby saving Pearson tens of millions of dollars in contribution expenses, Defendant Plan Committee dealt with the assets of the Plan in their own interest and for their own account.

142.    As a result of this prohibited conduct, Defendant Plan Committee caused the Plan to suffer losses in the amount of the Plan assets that were substituted for employer future contributions and the lost investment returns on those assets.

143.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

**FIFTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Plaintiffs, on behalf of Themselves and Class,**
**<u>Against Defendants Pearson and Board – Misallocation of Forfeitures</u>)**

144.    Plaintiffs restate the above allegations as if fully set forth herein.

145.    Defendants Pearson and Board had the authority to appoint and remove members or individuals responsible for Plan forfeitures on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

146.    In light of this authority, Defendants Pearson and Board had a duty to monitor those individuals responsible for Plan forfeitures on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Pearson Plan in the event that these individuals were not fulfilling those duties.

147.    Defendants Pearson and Board had a duty to ensure that the individuals responsible for Plan forfeitures possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Pearson Plan's forfeitures; and reported regularly to Defendants Pearson and Board.

148.    The objectively disloyal and conflicted manner in which Defendant Plan Committee handled Plan forfeitures inferentially establish that Defendants Pearson and Board breached their duty to monitor by, among other things:

(a)     Failing to monitor and evaluate the performance of individuals responsible for Plan forfeitures on the Plan Committee or have a system in place for doing so, standing idly by as the Pearson Plan misallocated Plan forfeiture for Pearson's benefit;

(b)     Failing to monitor the process by which the Plan Committee was evaluated and failing to investigate the proper use of Plan forfeitures; and

(c)     Failing to remove individuals responsible for Plan forfeitures on the Plan Committee whose performance was inadequate in that these individuals continued to misallocate Plan forfeitures for the benefit of Pearson.

149.    As the consequences of the breaches of the duty to monitor for Plan forfeitures, the Plaintiffs and Plan participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

150.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Pearson and Board are liable to restore to the Pearson Plan all losses caused by their failure to adequately monitor individuals responsible for Plan forfeitures on the Plan Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered and requests the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration the Defendants are fiduciaries, have breached their fiduciary duties of prudence under ERISA, and engaged in fiduciary prohibited transactions, causing harm to Plan participants and beneficiaries;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breach of the duty of loyalty and prohibited transactions, including restoring to the Plan all losses resulting from using Plan forfeitures to inappropriately benefit Pearson by reducing their future employer contributions, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had not engaged in prohibited transactions;

E.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breach of the fiduciary duty prudence by paying excessive

managed account fees, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

F.    An Order requiring Pearson to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Pearson as necessary to effectuate relief, and to prevent Pearson's unjust enrichment;

G.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

K.    Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: December 18, 2024

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

Peter B. Schneider (PS8320)
3700 Buffalo Speedway, Suite 960
Houston, Texas 77098
Tel.: (713) 338-2560
pschneider@schneiderwallace.com

**WALCHESKE & LUZI, LLC**

Paul M. Secunda (motion *pro hac vice* pending)
125 S. Wacker Dr., Suite 300
Chicago, Illinois 60606
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

James A. Bloom (motion *pro hac vice* pending)
2000 Powell Street, Suite 1400

Emeryville, California 94608
Tel.: (415) 421-7100
jbloom@schneiderwallace.com

*Attorneys for Plaintiffs and Proposed Class*